# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA , ) | Case No. 1:24-cr-00020 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE DAN AARON POLSTER |
| ) | |
| LAMAR GILBERT, ) | |
| ) | **ORDER & OPINION** |
| Defendant. ) | |
| ) | |

Defendant Lamar Gilbert has been charged with three counts of drug trafficking and one count of being a felon in possession of a firearm. The drugs and four firearms were all recovered in a December 28, 2023 search of Gilbert's residence pursuant to a state court search warrant issued the previous day. Gilbert has moved to suppress all images obtained October – December 2023 from pole camera surveillance on his house, plus all evidence obtained during the search which he asserts are fruits of the illegal surveillance.

For most of our country's history, surveillance of a suspect's residence was accomplished by stationing one or more law enforcement officers on the street to observe what was happening: who came and went, what they did when they met outside, etc. More recently, law enforcement has deployed pole cameras which continuously observe and record the exterior of the residence. Pole cameras have many advantages over human surveillance: they record 24/7; they can be monitored remotely from another location; the images can be archived and electronically searched; the images can be flagged when movement is detected; etc.

This case requires the Court to consider if, and when, the use of pole camera surveillance of a suspect's residence triggers the Fourth Amendment's prohibition against warrantless searches. The overwhelming weight of authority from courts around the country, including from the Sixth Circuit Court of Appeals, is that so long as the pole camera captures images of the exterior of the residence and its curtilage that could also be seen by human surveillance, no warrant is required. That was the case with the pole camera local law enforcement installed for 79 days to monitor Gilbert's residence, with one significant exception. The pole camera here was positioned so it could capture images of the interior of Gilbert's house through a second story window, and the parties have stipulated that this would have been impossible for a law enforcement officer stationed on the street to see. There is no evidence that officers positioned the camera with the intent to observe the interior of Gilbert's residence, there is no evidence cited in the search warrant affidavit that came from observation of the interior of Gilbert's residence, and neither the government nor Gilbert has posited that the surveillance of the interior of Gilbert's residence through the second story window uncovered anything of either an incriminating or private nature. Nevertheless, the law is clear that an individual enjoys a reasonable expectation of privacy in what happens inside his/her home, and Gilbert's Fourth Amendment rights were violated. Accordingly, the Court will suppress the use of any images captured by the pole camera in Gilbert's trial.

The inquiry does not stop there, however. Should a court determine that a portion of a search warrant affidavit was based upon illegally obtained evidence, or where a court concludes that a portion of the affidavit contains knowingly false statements, the court must excise those portions, and then examine the remainder of the affidavit to determine whether what is left demonstrates probable cause for the search. In this case, the affidavit, stripped of all the evidence obtained from the pole camera surveillance, satisfies probable cause. The beginning of the affidavit

2

contains the information received from a confidential informant ("CI") that Gilbert was dealing drugs and details the work law enforcement did connecting Gilbert to a specific residence and vehicle. Subsequent paragraphs detailed two closely monitored undercover purchases of narcotics from Gilbert, the first roughly four weeks before the date of the affidavit and the second within 72 hours of the date of the affidavit. In both cases, Gilbert left the residence and went directly to meet the CI who purchased the drugs from him. Accordingly, the Court will deny the motion to suppress the fruits of the search, which include the cocaine, heroin, fentanyl and crack cocaine forming the basis of the drug trafficking charges in Counts 1, 2 and 3 of the Indictment, and the four firearms forming the basis of the felon in possession charge in Count 4 of the Indictment.

**I.      Factual and Procedural Background**

In July 2023, members of the Drug Enforcement Administration ("DEA") and Cleveland Division of Police ("CPD") received information from a CI regarding Gilbert's alleged drug trafficking activities. ECF. 39 at 1. According to the CI, Gilbert lived at 1042 Ansel Road in Cleveland, Ohio ("Ansel Residence"). The house is located on the corner of Bellevue Avenue and Ansel Road. On October 12, 2023, law enforcement continued their investigation into Gilbert and conducted physical surveillance around the Ansel Residence. No activity was observed. On that same date, October 12, 2023, law enforcement then installed a remote electronic surveillance ("RES") device; they did so without a warrant. This RES is typically referred to as a "pole camera" due to its common placement on a public pole above the street, which was the case here. ECF 43-1.

The camera was located on a pole on Bellevue Ave. across the street from the Ansel Residence. It was aimed at the south/southwest side of the home, capturing footage of the outside of the residence, its curtilage, and several key areas such as the house's back entry ramp, backyard,

garage, and driveway, as well as the portion of Bellevue Ave. that passed by the residence. All these areas were visible from the public roadway. *Id.*

When the camera was turned towards the side of the Ansel residence, it could capture both the front and back yards. It also had a view of a second-story window, a perspective that was not observable from the public roadway. The camera system was capable of twenty-four-hour color recording, capturing detailed footage of everyone who arrived at or left the residence, as well as activities in the yard and interactions outside the residence. The pole camera recorded and archived this continuous footage, preserving every moment around the Ansel Residence. The footage was searchable and flagged moments when movement was detected. Law enforcement had the ability to view the footage live or replay it later. Additionally, officers could control the camera to turn, tilt, and zoom, providing flexibility in surveillance. *Id.*

Using the footage, along with a trash pull from the Ansel Residence, and two controlled buys from Gilbert,[1] law enforcement obtained a search warrant for the residence from the Cuyahoga County Court of Common Pleas. ECF 39-1. The search warrant was executed on December 28, 2023, while the camera was still in operation. The items found during the search became the subject of a four-count Indictment in this case, filed on January 23, 2024. ECF 15.

Gilbert challenged the admissibility of this warrantless surveillance video footage obtained from the pole camera, as well as the fruits of the search warrant, filing the motion for suppression on October 30, 2024. ECF 34. The Government filed its opposition on January 2, 2025, ECF 39, and Gilbert submitted a reply on January 24, 2025, ECF 41. On February 14, 2025, the Government filed a sur-reply, in which it submitted that an evidentiary hearing was not necessary. ECF 42. The Court ordered if both parties agree that the evidentiary hearing is nonessential, they were to provide

---

[1] Gilbert has not been charged with a crime in connection with these two controlled buys.

a joint stipulation of facts, which the parties submitted on February 21, 2025, ECF 43. However, the parties maintained a request for oral argument on the legal arguments of the case for suppression. *Id.* Following oral arguments February 27, 2025, the Court now turns to the merits of the Motion as the matter is ripe for ruling.

## II. Law & Analysis

An unreasonable search under the Fourth Amendment is unconstitutional. *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560-61 (6th Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). And, as the Government has conceded, precedent is clear in this circuit that a warrantless search is *per se* unreasonable, with only a few, clearly and specifically established exceptions. *See* ECF 39 at 3-4 (citing *Morgan*, 903 F.3d at 560-61). There is also no debate that the pole camera in this case was set up without obtaining a search warrant. ECF 43-1 at 1. That means the inquiry required for this Motion is twofold: 1) was there a search within the meaning of the Fourth Amendment; and 2) if so, is suppression warranted as a remedy?

### A. Did the Pole Camera Constitute an Unconstitutional Warrantless Search?

It is no secret that the rapid evolution of technology has complicated Fourth Amendment analyses across the country. Indeed, "one cannot say (and the police cannot be assured) that use of . . . relatively crude equipment . . . will always be lawful." *Kyllo v. United States*, 533 U.S. 27, 38 (2001). The Supreme Court's most recent cases dealing with this issue confronted the use of GPS trackers and historical cell site location information ("CSLI"). *See generally United States v. Jones*, 565 U.S. 400, 404 (2012); *Carpenter v. United States*, 585 U.S. 296 (2017). In both cases, Justices were concerned with the ability of technology to create a picture of the whole of one's movements. *See, e.g.*, *Jones*, 565 U.S. at 43 (Alito, J., concurring in judgment); *id.*, at 415 (Sotomayor, J., concurring); *Carpenter*, 585 U.S. at 311.

Though Gilbert raises compelling arguments about the societal and constitutional concerns surrounding long-term warrantless surveillance via pole cameras, so long as the technology utilized is only used to augment the senses and does not reveal intimate information that would not otherwise be observable by the public, courts have routinely upheld their constitutionality. *See, e.g.*, *United States v. Tuggle*, 4 F.4th 505 (7th Cir. 2021); *United States v. Hay*, 95 F.4th 1304 (10th Cir.), *cert. denied*, 145 S.Ct. 591 (2024); *United States v. Gregory*, No. 22-12800, 2025 WL 484576 (11th Cir. February 13, 2025); *but see Kyllo*, 533 U.S. at 34. While *Carpenter* did acknowledge a privacy right similar to the one Gilbert is advocating for here, the context in that case was significantly different. In *Carpenter*, the Justices confronted the fact that cell phones are virtually ubiquitous in modern society, and most individuals carry their cell phone with them everywhere they go. Since CSLI "chronicle[s] a person's past movements through the record of his cell phone signals," using CSLI can amount to effectively tailing an individual every day, 24/7 for that period, "provid[ing] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter*, 585 U.S. at 309, 311 (quotation omitted). With CSLI, law enforcement had the ability "travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers," meaning "police need not even know in advance whether they want to follow a particular individual, or when." *Id.* at 312.

This is in stark contrast to the more limited surveillance offered by a pole camera outside of an individual's home. Whereas CSLI is retrospective, allowing law enforcement to review movements and activities that have already taken place, a pole camera is purely prospective; that is, a pole camera can only record what happens after it is installed. Additionally, pole cameras are stationary, so if the individual leaves the immediate area around their home, these movements and

6

activities would not be captured. Even post-*Carpenter*, which Gilbert argues is a decisive case that changed how courts should view privacy expectations in public areas under the Fourth Amendment, the Sixth Circuit has upheld pole cameras in public spaces which monitor only what can be observed by a member of the public.[2] *See United States v. May-Shaw*, 955 F.3d 563 (6th Cir. 2020); *United States v. Trice*, 966 F.3d 506 (6th Cir. 2020). And this Court is bound by Sixth Circuit precedent.

That does not mean that every use of a pole camera is *per se* constitutional, either. "At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). It is uncontroverted that police may not observe the interior of a home in a way that could not be done by the ordinary passerby without a warrant. *Cf. Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Here, it is undisputed that the pole camera aimed at the Ansel Residence could see into the second story window of the home, and that this was a view not otherwise observable from the public roadway. ECF 43-1 at 1-2. That the interior of the home was captured by the pole camera makes this case different than *May-Shaw* or *Trice*, as the pole cameras in those cases only captured public spaces (as those opinions surely would have mentioned it if the cameras had captured otherwise protected areas). The pole cameras in those cases were upheld because "the cameras observed only what was possible for any member of the public to have observed," *May-Shaw*, 955 F.3d at 568-69 (cleaned up), and "there is no

---

[2] At oral argument, Gilbert argued that certain features of the pole camera itself in his case, in the aggregate, made it distinguishable from precedent, including that: 1) the camera connected to a handheld device which could provide on demand, real time remote access; 2) the footage was archived in a way that was searchable and allowed for quicker review; and 3) the camera flagged when it detected movement. However, the case law does not support the notion that the technological capabilities of the pole camera change the analysis; rather, the focus is on the defendant's reasonable expectations of privacy.

reasonable expectation of privacy in the activity of leaving a constitutionally protected area (the home) to an area without constitutional protection" such as the street, *Trice*, 966 F.3d at 520. In fact, the Government did not cite any case upholding the constitutionality of a pole camera where the camera could observe the interior of the home or an area that could not be seen by a passerby on the street. Because the pole camera was able to view into the home in a way not otherwise observable by the public, and it was set up without a warrant, the pole camera constitutes an unreasonable, and thus unconstitutional, search in violation of Gilbert's Fourth Amendment rights.

### B. What Amount of Suppression is Warranted?

Having concluded that the pole camera surveillance violated Gilbert's Fourth Amendment rights in this case, the Court now turns to what must be suppressed.

The Government argues that the reasonable belief exception established in *Leon* and its progeny should apply here, as it was reasonable for the officers to believe that they did not need a warrant to set up the pole camera. *United States v. Leon*, 468 U.S. 897 (1984). In that case, the Supreme Court noted that the purpose of the exclusionary rule is to deter unlawful police conduct, but that "it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 918-19. This is because "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *United States v. Peltier*, 422 U.S. 531, 539 (1975).

This Court need not address whether the pole camera generally should be permitted under the "good faith" exception, however, since the exception must be rejected for the same reason the pole camera constituted a search: because it could see into the interior of the Ansel Residence. The

8

Government contends that any capturing of the interior of the Ansel Residence through the second story window was incidental, highlighting the fact that the search warrant affidavit contained no information about observations into the home, and therefore should be excused. However, "[t]he Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." *Kyllo*, 533 U.S. at 37. Supreme Court precedent makes clear that "even a fraction of an inch" of an invasion into the home is too much. *Silverman*, 365 U.S. at 512. This law is well established, such that any law enforcement officer would be well aware of it. While it may not have been a deliberate decision to have the pole camera positioned in a manner that allowed officers to see into the second story window, officers knew or should have known that the camera was seeing into the interior of the Ansel Residence. The pole camera footage must be suppressed.

The next step is to excise the statements in the search warrant affidavit stemming from the pole camera footage, and then reevaluate to determine if the remaining statements are sufficient to show probable cause. *See United States v. Black*, 8 F. App'x 408, 411 (6th Cir. 2001) (holding that "under the fruit of the poisonous tree doctrine, the question [the court] must address is whether, despite any impermissibly tainted factual averments in the affidavit, the warrant nevertheless issued upon probable cause"); *see also United States v. Jenkins*, 369 F.3d 751, 759 (6th Cir. 2005) (noting that it makes sense to apply the same approach established in *Franks v. Delaware*, 438 U.S. 154 (1978), because "[k]nowingly including a false statement in a warrant affidavit seems the functional equivalent of (if not an even more serious transgression than) including in the affidavit knowledge of facts illegally obtained" (quotation omitted)). This is because "if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid." *United States v. Karo*, 468 U.S. 705, 719 (1984).

9

For an affidavit to support the issuance of a search warrant, it must show probable cause; in essence, the affidavit must establish a "'fair probability' that criminal evidence will be found in the place to be searched." *United States v. Elmore*, 18 F.4th 193 (6th Cir. 2021) (citing *United States v. Hines*, 885 F.3d 919 923 (6th Cir. 2018)). Though this requires more than "bare suspicion," it is neither an especially high bar. Probable cause is established "where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). This is necessarily a fact-intensive inquiry. *See United States v. Sanders*, 106 F.4th 455, 461-63 (6th Cir.), *cert. denied*, 145 S.Ct. 603 (2024) (describing general guidelines for how to direct a probable cause inquiry and collecting cases establishing the same). However, there are certain hallmarks that have been consistently upheld by courts as being sufficient to establish probable cause, including two seen here. The first

> involves a search warrant affidavit that adequately establishes both where a defendant resides as well as the defendant's active engagement in certain criminal activity. In those circumstances, an inference can reasonably be made (especially when aided by an affiant-officer's experience) that the "criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." . . . Instances of this nature involving drug crimes are sometimes described as "known drug dealer" cases. *See, e.g.*, *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002) (drug trafficking); *United States v. Kenny*, 505 F.3d 458, 461–62 (6th Cir. 2007) (drug manufacturing).

*Sanders*, 106 F.4th at 462. The second notable hallmark "involve[s] search warrants describing a controlled purchase of contraband followed by the defendant returning to the location sought to be searched, creating a reasonable inference that the defendant took the proceeds with him." *Id.* (citing to *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011), as an example).

10

Upon review of the remaining statements in the affidavit, the Court determines that there was still probable cause to issue the search warrant. To start, in July 2023, a reliable CI identified Gilbert as a person of interest. This CI showed the affiant a photo of an area drug trafficker known to deal in, among other drugs, crack cocaine, and who lived at the corner of Bellevue Ave. and Ansel Rd. (later identified to be the Ansel Residence). ECF 39-1 ¶ 1. The photo allowed the affiant to identify this individual as Gilbert, whose address is listed as at the corner of Bellevue Ave. and Ansel Rd. *Id.* The CI also noted that this trafficker drives a black 2023 Jeep Grand Cherokee, *id.* ¶ 4, and the affiant confirmed that Gilbert has this same make, model, and color vehicle registered in his name, *id.* ¶ 6. Additionally, the CI shared information with the affiant that Gilbert "sells large quantities of narcotics to other drug traffickers," as well as "smaller quantities of narcotics to drug users." *Id.* ¶ 2.

Later in the investigation, during the week of November 27, 2023, the police used a different CI to set up a controlled buy with Gilbert. *Id.* ¶ 25. Police had the CI contact Gilbert to order crack cocaine, and Gilbert provided the CI with a location to meet. *Id.* One team of investigators kept the CI under constant surveillance, following the CI directly to the meet location and to a predetermined location once the controlled buy was complete. *Id.* ¶¶ 25-27. At the same time, another team of investigators also kept Gilbert under constant surveillance. *Id.* ¶ 26. This team followed Gilbert from his home at the Ansel Residence as Gilbert drove directly from the Ansel Residence to the meet location, where Gilbert sold the CI a quantity of crack cocaine. *Id.*

Finally, the police had the CI arrange another controlled buy with Gilbert no more than 72 hours before the affidavit was signed on December 22, 2023. *Id.* ¶ 34. As was the case with the controlled buy a month prior, a team of investigators followed the CI directly to the area of the meet location with Gilbert, and then again to a predetermined location once the buy was complete.

11

*Id.* ¶¶ 35-36. The affiant personally observed Gilbert leave the Ansel Residence before Gilbert arrived at the meet location and made a hand-to-hand transaction of crack cocaine for money with the CI. *Id.* ¶ 35.

It is likely the second controlled buy would suffice to show probable cause, but certainly when both controlled buys in conjunction with the information law enforcement learned in July 2023, the affidavit clearly establishes a "fair probability" of criminal activity. *See United States v. Christian*, 925 F.3d 305, 309, 312 (6th Cir. 2019) (affirming that the probable cause inquiry requires a holistic look at what the affidavit shows, considering the totality of the circumstances); *Sanders*, 106 F.4th at 461 ("In the end, whatever nomenclature one uses to describe the concept, probable cause, at its core, 'depends on the totality of the circumstances.'" (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Because there is an independent basis for upholding the validity of the search warrant, this Court will not suppress the evidence seized from the Ansel Residence during the execution of that warrant.

### III. Conclusion

For the reasons stated herein, Defendant Gilbert's motion to suppress the pole camera footage is GRANTED. The motion to suppress the fruits of the December 28, 2023 search, however, is DENIED.

**IT IS SO ORDERED.**

Dated: March 5, 2025                          *s/Dan Aaron Polster*
                                                         United States District Judge